# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 20, 2006  Decided December 19, 2006

No. 05-1342

WILLIAMS GAS PROCESSING-GULF COAST
COMPANY, L.P., ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PRODUCER COALITION, ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*James T. McManus* argued the cause for petitioners. With him on the briefs were *Joseph S. Koury*, *Mari M. Ramsey*, and *David A. Glenn*.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Thomas J. Eastment* argued the cause for intervenors Dominion Exploration & Production, Inc., et al. With him on

the brief were *Adam J. White*, *James M. Costan*, *Charles J. McClees*, *Douglas W. Rasch*, *Bruce A. Connell*, and *Frederick T. Kolb*.

Before: SENTELLE and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Williams Gas Processing-Gulf Coast Co. ("WGP") and Transcontinental Gas Pipe Line Corp. ("Transco") petition for review of two Federal Energy Regulatory Commission ("FERC" or "the Commission") orders asserting jurisdiction over a natural gas pipeline off the coast of Louisiana. *See Transcontinental Gas Pipe Line Corp.*, 111 F.E.R.C. ¶ 61,498 (2005) ("*2005 Transco Rehearing Order*"); *Transcontinental Gas Pipe Line Corp.*, 111 F.E.R.C. ¶ 61,090 (2005) ("*2005 Transco Jurisdictional Order*"). Under the Natural Gas Act ("NGA" or "the Act"), 15 U.S.C. §§ 717-717z, FERC has jurisdiction over pipelines that "transport" natural gas, but not over those that "gather" it. But the Act does not define these terms, leaving FERC to create a test that will rationally and reliably distinguish between the two types of pipeline. FERC's efforts to properly classify Transco's pipeline are emblematic of its struggle to complete this task.

In 2001, FERC disclaimed jurisdiction over a 12.43 mile, 24-inch diameter pipeline in Transco's Central Louisiana system lying downstream of the pipeline facilities of Jupiter Energy Corp. ("Jupiter"). *Transcontinental Gas Pipe Line Corp.*, 96 F.E.R.C. ¶ 61,246 (2001) ("*2001 Transco Jurisdictional Order*"), *reh'g denied in relevant part*, *Transcontinental Gas Pipe Line Corp.*, 97 F.E.R.C. ¶ 61,298 (2001) ("*2001 Transco Rehearing Order*"). This court upheld FERC's 2001 orders as supported by substantial evidence and not arbitrary and

capricious. *Williams Gas Processing-Gulf Coast Co. v. FERC*, 331 F.3d 1011 (D.C. Cir. 2003) ("*WGP-Transco I*").

In 2003, in a separate proceeding initiated by Jupiter, FERC determined that an 8-inch Jupiter pipeline feeding into the 24-inch Transco lateral serves a transportation function. *Jupiter Energy Corp.*, 103 F.E.R.C. ¶ 61,184 (2003), *reh'g denied*, *Jupiter Energy Corp.*, 105 F.E.R.C. ¶ 61,243 (2003) ("*2003 Jupiter Rehearing Order*"). The consequence of this ruling was that a jurisdictional pipeline (Jupiter) flowed into a non-jurisdictional pipeline (Transco). On review, the Fifth Circuit vacated and remanded, holding that the Commission's decision was arbitrary and capricious because Jupiter's transportation pipeline sat upstream of a Transco gathering pipeline. *Jupiter Energy Corp. v. FERC*, 407 F.3d 346, 350-51 (5th Cir. 2005) ("*Jupiter Appeal*"). The Fifth Circuit noted that FERC's Jupiter orders produced an "anomalous scenario," to wit: "A series of *gathering* pipelines (upstream . . .) feed[ing] into a *transportation* pipeline (Jupiter's 8-inch line), . . . in turn feed[ing] into a *gathering* pipeline (the Transco line)." *Id.* at 350. The court concluded that "this cannot be considered consistent." *Id.*

In 2004, before the Fifth Circuit's *Jupiter Appeal* decision had been handed down, FERC issued an order requiring WGP and Transco to show cause why the agency's *2001 Transco Jurisdictional Order* should not be reversed as "anomalous" in light of the Jupiter orders. *Transcontinental Gas Pipe Line Corp.*, 107 F.E.R.C. ¶ 61,122 (2004) ("*Show Cause Order*"). Shortly after the Fifth Circuit vacated the Jupiter orders, FERC reversed its prior determination and held that the Transco lateral directly downstream of the Jupiter facility serves a transportation function. *2005 Transco Jurisdictional Order*, 111 F.E.R.C. ¶ 61,090.

On June 28, 2005, FERC issued two decisions. First, in the case on remand from the Fifth Circuit, the Commission affirmed

its jurisdictional determination in the Jupiter orders. *Jupiter Energy Corp.*, 111 F.E.R.C. ¶ 61,497 (2005). Second, FERC denied the request for rehearing of its *2005 Transco Jurisdictional Order*, on the grounds that the disputed 2001 orders were issued "on the basis of incomplete information," and "no gas is collected along the length of Transco's downstream line." *2005 Transco Rehearing Order*, 111 F.E.R.C. ¶ 61,498. The Jupiter orders are now pending review before the Fifth Circuit and the challenges to the Commission's *2005 Transco Jurisdictional Order* and *2005 Transco Rehearing Order* are at the heart of the petition for review in this case.

WGP and Transco's principal argument is that it was unlawful for FERC to reconsider its prior conclusion regarding Transco's pipeline segment lying downstream of the pipeline facilities of Jupiter. Petitioners argue, in particular, that "[t]he Commission's lone finding and premise . . . that the subject pipeline facility is not a 'gathering' facility solely because, purportedly, no gas was collected along that pipeline . . . is contrary to the facts of record." Petitioners' Reply Br. at 2. Petitioners also contend that, because "the Commission . . . previously decided these same facilities to be gathering in final, court-affirmed orders, the Commission is barred from re-deciding these same issues." *Id.*

WGP and Transco are right in their observation that "[t]his is a classic case of an agency, both in its orders under review and its brief to this Court, failing to demonstrate that it has engaged in reasoned decisionmaking." *Id.* They are wrong, however, in suggesting that FERC was without authority to reconsider its *2001 Transco Jurisdictional Order*. Indeed, petitioners' counsel conceded at oral argument that it is within FERC's authority to make jurisdictional determinations that rest on the premises that (1) there is one point on any given route where gathering stops and transportation begins, and (2) a transportation pipeline cannot feed into a gathering pipeline.

*See* Recording of Oral Argument at 12:06. These two points were highlighted by the Fifth Circuit in the *Jupiter Appeal* decision. 407 F.3d at 350-51. If these two principles apply, then FERC might be justified in finding that both the Jupiter and Transco lines are jurisdictional facilities. The problem here is that the agency's rationale underlying the disputed *2005 Transco Jurisdictional Order* and *2005 Transco Rehearing Order* only hints at these principles.

In its briefs to this court, FERC argues that it revisited its *2001 Transco Jurisdictional Order* to eliminate a "fundamental inconsistency" in its case law. Respondent's Br. at 3, 13. The Commission could have stated as much in its 2005 orders and justified the policy shift, for an agency is free to change course in a regulatory regime provided that it offers a reasoned explanation for so doing and is not otherwise constrained by statutory limitations. We are forced to vacate the 2005 orders, however, because *in those decisions*, FERC neither explained its action as consistent with precedent nor justified it as a reasoned and permissible shift in policy. Although these orders ultimately may prove to be justified on the merits, they are presently wanting for lack of reasoned decisionmaking.

## I. BACKGROUND

The Natural Gas Act grants FERC the power to regulate "the transportation [or 'transmission'] of natural gas in interstate commerce" but not "the production or gathering of natural gas." 15 U.S.C. § 717(b). Until fairly recently, companies sold gas under rates that encompassed both gathering and transportation services. *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1195 n.2 (D.C. Cir. 2000). However, "in the wake of major regulatory changes in the natural gas industry," including the unbundling of gathering and transportation services, *Conoco Inc. v. FERC*, 90 F.3d 536, 539-41 (D.C. Cir. 1996), companies primarily engaged in transporting gas "no longer need[] to operate" gathering facilities, *Lomak*, 206 F.3d at 1195. As a

result, many natural gas transporters have sought to separate their transportation and gathering facilities, through transfer (otherwise known as "spindown") of the latter to gathering affiliates. *See WGP-Transco I*, 331 F.3d at 1015.

Because the NGA does not define gathering and transportation, FERC is responsible for drawing the "not always clear" line between the two. *See ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1076-77 (D.C. Cir. 2002) (quoting *Conoco*, 90 F.3d at 542). Gathering facilities are generally understood to be pipelines that collect gas from wells (where gas originates) and deliver it into pipelines which will transport it in interstate commerce. *Id.* at 1076; *Conoco*, 90 F.3d at 539 n.2. However, since on any given route between the wells (upstream) and the final destination (downstream), various pipeline segments may be owned by different companies, it is no mean feat for the agency to determine which segments serve a gathering function and which do not. Faced with this reality and inundated with requests for jurisdictional clarification, *see Gas Pipeline Facilities & Servs. on the Outer Cont'l Shelf*, 74 F.E.R.C. ¶ 61,222, at 61,751-52 (1996), FERC has had trouble finding its footing. *See ExxonMobil*, 297 F.3d at 1087 ("FERC has been struggling with the reclassification of facilities . . . ."); *Shell Gas Pipeline Co.*, 74 F.E.R.C. ¶ 61,277, at 61,895 (1996) ("[T]he development of an appropriate methodology has been an ongoing task . . . .").

In *Farmland Industries, Inc.*, 23 F.E.R.C. ¶ 61,063 (1983), FERC announced the "primary function test," under which it considers six factors to determine the jurisdictional status of a pipeline: "(1) the pipelines' length and diameter; (2) the central point in the field; (3) the facility's geographic configuration or pattern; (4) the location of compressors and processing plants, particularly where the pipelines are located behind[, *i.e.* upstream of,] the [processing] plant; (5) the location of wells along all or part of the facilities; and (6) the line[s'] operating

pressure." *WGP-Transco I*, 331 F.3d at 1014. Only six years later, however, the Fifth Circuit found fault with the test, because it ignored the geographical realities of offshore gas collection (where pipelines serving a gathering function often need to be larger and longer) and focused instead on purely physical criteria. *EP Operating Co. v. FERC*, 876 F.2d 46, 48-49 (5th Cir. 1989). The primary function test was seen by the court as failing to classify facilities with "marked similarities in operational characteristics" the same way. *Id.* at 50.

In response, FERC modified its primary function test to include "a sliding scale which will allow the use of gathering pipelines of increasing lengths and diameters in correlation to the distance from shore and the water depth of the offshore production area." *Amerada Hess Corp.*, 52 F.E.R.C. ¶ 61,268, at 61,988 (1990). It also announced that it would consider "nonphysical criteria such as the purpose, location and operation of the facility, the general business activity of the owner of the facility, and whether the jurisdictional determination is consistent with the objectives of the NGA . . . ." *Id.* at 61,987; *see Sea Robin Pipeline Co. v. FERC*, 127 F.3d 365, 369 (5th Cir. 1997) ("*Sea Robin I*"). After several years, however, the Fifth Circuit concluded that FERC had once again failed to create a viable test. According to the court, FERC had "reverted," committing exactly the same error criticized in *EP Operating*: it treated the physical size of the pipeline as presumptive. *Id.* at 370. The court also found that the Commission was relying too much on nonphysical factors, which, while "relevant, . . . are only part of the mix" and should be treated as "secondary to the physical factors." *Id.* at 371. Because, in the court's view, FERC seemed unable to consistently resolve when gathering ceases and transportation commences, the Fifth Circuit invited FERC to "reformulate" its primary function test another time. *Id.*

On remand, FERC revised the test. First, FERC concluded that the "behind-the-plant" factor should be given less weight in the offshore context, because almost all offshore facilities are situated upstream of processing plants. *Sea Robin Pipeline Co.*, 87 F.E.R.C. ¶ 61,384, at 62,425 (1999) ("*Sea Robin II*"), *reh'g denied, Sea Robin Pipeline Co.*, 92 F.E.R.C. ¶ 61,072 (2000) ("*Sea Robin II Rehearing Order*"). FERC then replaced the "central point in the field" factor used in the onshore context with a "centralized aggregation" inquiry into whether "there exists a central location where gas is aggregated for further transportation to shore." *Id.* FERC stated that its revised test would enable it to consistently discern the "point at which the collection or gathering of gas ends, and interstate transmission begins." *Id.* at 62,427.

In its order denying rehearing of *Sea Robin II*, FERC stated, "[T]he Commission does not agree that the fact of Sea Robin's upstream interconnection with [a jurisdictional facility], by itself, compels a finding that the east leg of Sea Robin's system is jurisdictional." *Sea Robin II Rehearing Order*, 92 F.E.R.C. ¶ 61,072, at 61,295. ExxonMobil sought review before this court arguing, *inter alia,* that "FERC's jurisdictional ruling has created an utterly illogical situation, wherein gas is transported on a jurisdictional pipeline . . . into a non-jurisdictional gathering leg of Sea Robin's pipeline." *ExxonMobil*, 297 F.3d at 1087 (internal quotation marks omitted). After canvassing FERC's case law, we held that "the presence of an interconnection with an upstream jurisdictional facility [does not compel] a finding that the downstream facility is likewise jurisdictional." *Id.* Based on the historical treatment of the lines in question, we explained that, "[i]f anything," the jurisdictional line upstream of the Sea Robin facility "ha[d] been erroneously classified." *Id.* We accepted FERC's argument that the "inconsistent treatment of the [upstream] pipeline and the Sea Robin pipeline" did not necessarily render the decision arbitrary and capricious and upheld the classification. *Id.* at 1087, 1089.

Such was the state of FERC's primary function test when Transco asked FERC to authorize the spindown of its Central Louisiana system to WGP, and WGP in turn petitioned FERC for a declaratory order disclaiming jurisdiction over the facilities. After considering each factor of the revised primary function test, FERC found that a large central pipeline, "the spine," serves a transportation function, while "6 to 24-inch offshore lateral lines connect at various locations into the spine and serve to collect gas from the surrounding production areas." *2001 Transco Jurisdictional Order*, 96 F.E.R.C. ¶ 61,246, at 61,976. FERC concluded that these lateral lines "serve to gather gas from production located in their vicinity." *Id.* FERC denied rehearing with respect to the laterals' classification, *see 2001 Transco Rehearing Order*, 97 F.E.R.C. ¶ 61,298, and we upheld the 2001 orders as supported by substantial evidence and not arbitrary and capricious, *see WGP-Transco I*, 331 F.3d 1011.

Before this court's decision had issued in *WGP-Transco I*, FERC conducted a separate jurisdictional status proceeding covering Jupiter's 8-inch line upstream of and feeding into one of the 24-inch Transco laterals. *Jupiter Energy Corp.*, 103 F.E.R.C. ¶ 61,184. Focusing heavily on the centralized aggregation point factor, FERC concluded that the Jupiter pipeline performs a transportation function. *Id.* at 61,713. Jupiter sought rehearing, arguing that the presence of Transco's gathering lateral downstream of the Jupiter pipeline foreclosed a finding that the facility engages in transportation. *2003 Jupiter Rehearing Order*, 105 F.E.R.C. ¶ 61,243. FERC concluded that its 2001 orders "cannot now be the basis for claiming that Jupiter's facilities should also be declared to be gathering." *Id.* at 62,286. In a footnote, FERC reversed the position it had taken in its *Sea Robin II Rehearing Order* and declared that "[t]he presence of upstream transmission facilities determines the classification of downstream facilities, not the opposite." *Id.* at n.8.

Seemingly uncomfortable with the muddle it had created – "[a] series of *gathering* pipelines" feeding into "a *transportation* pipeline (Jupiter's 8-inch line), . . . in turn feed[ing] into a *gathering* pipeline (the Transco line)," *Jupiter Appeal*, 407 F.3d at 350 – FERC issued an order requiring WGP and Transco to show cause why the *2001 Transco Jurisdictional Order* should not be reversed as "anomalous" in light of the Jupiter orders. *Show Cause Order*, 107 F.E.R.C. ¶ 61,122, at 61,411. FERC also repeated the declaration contained in its Jupiter footnote that upstream transportation facilities determine the classification of downstream facilities. *Id.*

Before FERC could address the *Show Cause Order*, the Fifth Circuit vacated FERC's Jupiter orders. *Jupiter Appeal*, 407 F.3d 346. The Fifth Circuit highlighted that FERC's *Sea Robin II* decision endorsed the principle that "there is *one* point on any given route where gathering stops and transportation begins." *Id.* at 350. The Fifth Circuit therefore reasoned that, because FERC had "already set the jurisdictional boundary downstream from one of Jupiter's pipelines," it was "arbitrary for the Commission now to set a jurisdictional dividing point [further upstream]." *Id.* at 351. The court vacated the Jupiter orders as anomalous and inconsistent. *Id.* at 350-51.

Just a week after the Fifth Circuit vacated the Jupiter orders, FERC decided that WGP and Transco had failed to show cause sufficient to prevent reclassification of the 24-inch lateral. *2005 Transco Jurisdictional Order*, 111 F.E.R.C. ¶ 61,090. In the "Background" section of its decision, FERC stated: (1) since it had not been aware that a transportation facility stood upstream of the lateral when it disclaimed jurisdiction over it in 2001, its determination "was made on the basis of incomplete information"; and (2) "[t]he presence of upstream transmission facilities determines the classification of downstream facilities, not the opposite." *Id.* at 61,411. In the "Discussion" section of its decision, FERC based its conclusion that Transco's 24-inch

lateral actually serves a transportation function on one fact: unlike the gathering arms of the Sea Robin pipeline, "[n]o gas is collected along the Jupiter pipeline." *Id.* at 61,413.

On June 28, 2005, FERC issued two decisions. First, FERC affirmed its jurisdictional determination in the Jupiter orders. In so doing, FERC noted that, because Transco's pipeline was being reclassified from gathering to transportation, "the inconsistency identified by the [Fifth Circuit] no longer exists." *Jupiter Energy Corp.*, 111 F.E.R.C. ¶ 61,497. Second, FERC denied Transco's request for rehearing, offering two rationales in a five-paragraph decision: (1) the 2001 orders were issued "on the basis of incomplete information"; and (2) "no gas is collected along the length of Transco's downstream line." *2005 Transco Rehearing Order*, 111 F.E.R.C. ¶ 61,498. FERC provided no other reasoning or factual support for its conclusion. WGP and Transco now seek review in this court.

## II. ANALYSIS

### A. *Standard of Review*

We must vacate FERC's 2005 orders if they are arbitrary and capricious. 5 U.S.C. § 706(2)(A); *see ExxonMobil*, 297 F.3d at 1083. We therefore look to whether FERC "articulated a rational explanation for its action." *AT&T Inc. v. FCC*, 452 F.3d 830, 837 (D.C. Cir. 2006) (quoting *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 921 (D.C. Cir. 1985)). Reasoned decisionmaking necessarily requires consideration of relevant precedent. *See Brusco Tug & Barge Co. v. NLRB*, 247 F.3d 273, 278 (D.C. Cir. 2001) ("[I]t is 'axiomatic that [agency action] must either be consistent with prior [action] or offer a reasoned basis for its departure from precedent . . . .'" (quoting *ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1443 (D.C. Cir. 1997))). However, it is well understood that

> [a]n agency is free to discard precedents or practices it no longer believes correct. Indeed we expect that an[] agency

> may well change its past practices with advances in knowledge in its given field or as its relevant experience and expertise expands. If an agency decides to change course, however, we require it to supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.

*Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1296 (D.C. Cir. 2004) (per curiam) (internal citations and quotation marks omitted); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis . . . .") (internal quotation marks omitted); *see, e.g.*, *Office of Commc'n, Inc. of the United Church of Christ v. FCC*, 327 F.3d 1222, 1228-29 (D.C. Cir. 2003) (upholding policy-shift where agency adequately explained its departure); *ANR Pipeline Co. v. FERC*, 205 F.3d 403, 407 (D.C. Cir. 2000) ("An agency may not of course depart from prior policy without explanation. But FERC explained how changed circumstances justified a new policy."); *Busse Broad. Corp. v. FCC*, 87 F.3d 1456, 1458 (D.C. Cir. 1996) (upholding agency action where "to the extent the agency departed from precedent, it offered a reasonable explanation for doing so").

Arbitrary and capricious review "demands evidence of reasoned decisionmaking *at the agency level*; agency rationales developed for the first time during litigation do not serve as adequate substitutes." *Kansas City v. HUD*, 923 F.2d 188, 192 (D.C. Cir. 1991); *see Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006) ("Nor can our Court fill in critical gaps in [an agency's] reasoning. We can only look to the [agency's] stated rationale. We cannot sustain its action on some other basis the [agency] did not mention."); *Williams Gas Processing-Gulf Coast Co. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004) ("It is axiomatic that we may uphold agency orders based only on

reasoning that is fairly stated by the agency in the order under review . . . .").

WGP and Transco point out that in 2001 FERC applied each factor of its primary function test and concluded that Transco's 24-inch lateral performs a gathering function; yet, in 2005, FERC reached the opposite conclusion, Petitioners' Br. at 19-20, but without the requisite support for such a drastic change in course, *id.* at 18, 25. The simple question here is whether FERC's reclassification of the Transco lateral is justified either as consistent with precedent or as a considered departure therefrom. In other words, are the contested 2005 orders supported by reasoned decisionmaking?

## B. *FERC's "Incomplete Information" Rationale Is Inadequate*

FERC justified its 2005 orders in part by stating that its original decision was based on incomplete information. On this point, the Commission claims that it did not become aware that the Transco lateral sat downstream of a line properly classified as jurisdictional until after the 2001 proceedings. *See 2005 Transco Rehearing Order*, 111 F.E.R.C. ¶ 61,498, at 63,113; *2005 Transco Jurisdictional Order*, 111 F.E.R.C. ¶ 61,090, at 61,411. But FERC never explained why the classification of the Jupiter facility is relevant to the jurisdictional status of the Transco lateral under existing precedent. The only statement approximating a clarification of the "incomplete information" rationale can be found in a blanket assertion contained in the "Background" section of the earlier of the two 2005 orders: FERC declared, "The presence of upstream transmission facilities determines the classification of downstream facilities, not the opposite." *2005 Transco Jurisdictional Order*, 111 F.E.R.C. ¶ 61,090, at 61,411.

But FERC simply cited the Jupiter footnote (where it had first stated the proposition without explanation). FERC made no

attempt to square this new policy statement with its directly contradictory stance in *Sea Robin II Rehearing Order* and this court's decision in *ExxonMobil*. In *Sea Robin II Rehearing Order*, FERC stated, "[T]he Commission does not agree that the fact of Sea Robin's upstream interconnection with [a jurisdictional facility], by itself, compels a finding that the east leg of Sea Robin's system is jurisdictional." 92 F.E.R.C. ¶ 61,072, at 61,295. And in *ExxonMobil*, FERC convinced this court to conclude that "the presence of an interconnection with an upstream jurisdictional facility [does not compel] a finding that the downstream facility is likewise jurisdictional." 297 F.3d at 1087. Now FERC asserts that it must reclassify a downstream line because "[t]he presence of upstream transmission facilities determines the classification of downstream facilities." *2005 Transco Jurisdictional Order*, 111 F.E.R.C. ¶ 61,090, at 61,411. FERC's rationale could hardly be more inconsistent with precedent. And "FERC's attempts to distinguish its precedents . . . [are] nonexistent." *PG&E Gas Transmission, Nw. Corp. v. FERC*, 315 F.3d 383, 389 (D.C. Cir. 2003).

## C. *FERC's Inconsistent Precedents and Changing Policy*

FERC's new assertion that a facility downstream of a jurisdictional pipeline must also be jurisdictional finds support in two interrelated principles which FERC once embraced but recently rejected: (1) there is one point along every route at which gathering ceases and transportation begins, and (2) a transportation facility cannot feed into a gathering facility.

In a 1996 Policy Statement, FERC announced, "[W]here gas is destined for interstate commerce, there is necessarily a point at which the gathering or collection of the gas ends, and interstate transportation begins." *Gas Pipeline Facilities*, 74 F.E.R.C. ¶ 61,222, at 61,757. In *Sea Robin I*, the Fifth Circuit treated this principle as a settled component of FERC policy: "The determinative question is when did gathering cease and transportation commence." 127 F.3d at 371. And indeed, on

remand FERC apparently endorsed that notion. *Sea Robin II*, 87 F.E.R.C. ¶ 61,384, at 62,427 ("[T]here is necessarily a point at which the collection or gathering of gas ends, and interstate transmission begins."); *see also Dauphin Island Gathering Sys.*, 93 F.E.R.C. ¶ 61,198, at 61,653 (2000) (same). Yet, in *Sea Robin II*, *Sea Robin II Rehearing Order*, and *ExxonMobil*, FERC issued and defended an order which resulted in a route changing from jurisdictional to non-jurisdictional and back to jurisdictional. FERC thus recently eschewed the first principle and persuaded this court to do so as well.

FERC's treatment of the second principle follows a similar course. In 1983, FERC stated, "[B]ecause the movement of gas through the Coronado system can be classified as intrastate pipeline 'transportation,' we cannot find the subsequent downstream movement of gas from that system to be exempt 'gathering.'" *Galaxy Energies, Inc.*, 24 F.E.R.C. ¶ 61,121, at 61,304 (1983). More recently, FERC declared, "[A] facility functionalized as gathering may not be located downstream of facilities functionalized as transmission." *Trunkline Gas Co.*, 70 F.E.R.C. ¶ 61,163, at 61,503 (1995); *see also Dauphin Island*, 93 F.E.R.C. ¶ 61,198, at 61,652 ("[I]t would be incongruous for gas flowing on an upstream transportation line to be delivered into a downstream gathering line."). But in 2002, FERC convinced this court to distinguish *Trunkline* as a case in which "the classification of the upstream system was in dispute," and reject the "proposition that the presence of an interconnection with an upstream jurisdictional facility compels a finding that the downstream facility is likewise jurisdictional." *ExxonMobil*, 297 F.3d at 1087.

In *Jupiter Appeal*, the Fifth Circuit assumed that the first principle constituted FERC's own tenet, and that the second principle necessarily flows from the first. 407 F.3d at 350-51. Indeed, the pull of the principles provides a logical explanation for FERC's 2005 orders. If there can only be one point along

any given route at which the function of facilities changes, then the situation FERC created – where a transportation pipeline fed into a gathering pipeline which, in turn, fed into a transportation pipeline – was in fact anomalous and required reconsideration. Likewise, if a gathering facility cannot sit downstream of a transportation facility, FERC was required – as a matter of reason – to change either the classification of the Jupiter pipeline or the Transco lateral. Moreover, if the two principles demand corrective action where a transportation facility sits upstream of a gathering facility, FERC's apparent new statement of policy can be seen to proffer a third principle guiding resolution: "[t]he presence of upstream transmission facilities determines the classification of downstream facilities, not the opposite." *2005 Transco Jurisdictional Order*, 111 F.E.R.C. ¶ 61,090, at 61,411.

It would thus appear that FERC's "incomplete information" rationale rests on its tacit adoption of these two principles and application of a new policy derived from them. Only if FERC views the principles as inviolate, does FERC's "incomplete information" rationale begin to make sense.

## D. *The 2005 Orders Lack Reasoned Decisionmaking*

The problem with FERC's "incomplete information" rationale is that it is not supported by any reasoned analysis *in the orders themselves*. Although we suspect that the orders may reflect an unstated endorsement of the two principles discussed above, we have no good basis upon which to rest this supposition. Arbitrary and capricious review strictly prohibits us from upholding agency action based only on our best guess as to what reasoning truly motivated it. *Columbia Gas Transmission Corp. v. FERC*, 448 F.3d 382, 387 (D.C. Cir. 2006) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947))); *PDK Labs. Inc. v. DEA*,

362 F.3d 786, 798 (D.C. Cir. 2004) ("[I]t is important to remember that if we find that an agency's stated rationale for its decision is erroneous, we cannot sustain its action on some other basis the agency did not mention."); *AT&T Corp. v. FCC*, 236 F.3d 729, 734-35 (D.C. Cir. 2001) ("[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given." (quoting *State Farm*, 463 U.S. at 43)).

In order to rely on the two principles, FERC had to acknowledge the need to reconsider its precedent, announce its definitive adoption of the principles, and explain their impact on the existing primary function test. If FERC intended to adopt a new policy specifying that the classification of the downstream facility must yield where the principles demand corrective action, FERC was obliged to explain that extension of its case law as well. *See PG&E Gas*, 315 F.3d at 390 ("FERC has given no explanation whatsoever for this apparent shift in Commission policy. FERC's failure to come to terms with its own precedent reflects the absence of a reasoned decisionmaking process."); *Mo. Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000) ("A passing reference . . . is not sufficient to satisfy the Commission's obligation to carry out reasoned and principled decisionmaking. We have repeatedly required the Commission to fully articulate the basis for its decision.") (internal quotation marks omitted). But instead of openly acknowledging its intention to reverse course to bring order to its case law, FERC attempted to "gloss[] over" its prior holding in *Sea Robin II Rehearing Order* and its position in *ExxonMobil*, and, in so doing, "cross[ed] the line from the tolerably terse to the intolerably mute." *PG&E Gas*, 315 F.3d at 390 (internal quotation marks omitted).

In its briefs, FERC attempts to make the required showing, explaining that the Commission reversed the Transco lateral's classification in order to eliminate a "fundamental inconsistency" in its case law. Respondent's Br. at 3, 13. But

counsel's explanation to this court cannot substitute for "reasoned decisionmaking *at the agency level.*" *Kansas City*, 923 F.2d at 192; *see Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 145 (D.C. Cir. 2005) ("[The agency] – not its counsel and not this court – is charged by the Congress with bringing its expertise and its best judgment to bear upon [an issue of policy]."); *Village of Bensenville v. FAA*, 376 F.3d 1114, 1121 (D.C. Cir. 2004) ("We do not ordinarily consider agency reasoning that 'appears nowhere in the [agency's] order.'" (quoting *PanAmSat Corp. v. FCC*, 198 F.3d 890, 897 (D.C. Cir. 1999))). Since we conclude that FERC neither explained how the "incomplete information" finding fit within its muddled case law nor rehabilitated that morass by clearly charting a new course, we find that the rationale cannot support the 2005 orders.

This conclusion is dispositive. Although FERC rested its decision on both the "incomplete information" rationale and its finding that no gas is collected along either the Jupiter pipeline or the Transco lateral, it did so without according the two conclusions individual weight. "[W]hen an agency relies on multiple grounds for its decision, some of which are invalid," we may only "sustain the decision [where] one is valid and the agency would clearly have acted on that ground even if the other were unavailable." *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717-18 (D.C. Cir. 2006) (internal quotation marks omitted); *see Int'l Union, United Mine Workers v. Dep't of Labor*, 358 F.3d 40, 44-45 (D.C. Cir. 2004) (finding that an agency "failed to provide an adequate explanation for its decision" where "[t]wo of the three reasons it gave . . . would not support its decision," and the court did "not know – nor [was it] free to guess – what the agency would have done had it realized that it could not justify its decision [based on the two invalid grounds]"). Here, the 2005 orders do not reveal whether FERC would have reclassified the Transco lateral on the basis of its lack of gas collection finding alone. *See* Recording of Oral Argument at 24:33 (admitting that the 2005 orders do not

indicate the relative weight accorded to the two bases). The assurance of FERC's counsel, *see id.* at 25:03 (urging the court to uphold the decision based on the lack of gas collection rationale alone), does not provide an acceptable substitute. *Allegheny Power v. FERC*, 437 F.3d 1215, 1226 (D.C. Cir. 2006) (refusing to consider counsel's clarification of a standard where "counsel ha[d] pointed to nothing said by FERC itself establishing such a concept"); *KeySpan-Ravenswood, LLC v. FERC*, 348 F.3d 1053, 1059 (D.C. Cir. 2003) ("[P]ost hoc salvage operations of counsel cannot overcome the inadequacy of the Commission's explanation.") (internal quotation marks omitted). We thus need not inquire into the validity of FERC's lack of gas collection rationale. *See* Petitioners' Br. at 19-25 (arguing that FERC's lack of gas collection justification is inconsistent with FERC precedent); Respondent's Br. at 15-19 (contending that the lack of gas collection rationale is consistent with precedent); Intervenors' Br. at 11-13 (same). Because FERC rested its determination, at least in part, on its infirm "incomplete information" ground, we must find the 2005 orders devoid of reasoned decisionmaking and set them aside as arbitrary and capricious.

### III. CONCLUSION

For the reasons stated above, we vacate FERC's 2005 orders and remand to the agency for further proceedings consistent with this opinion. We offer no judgment on the merits of FERC's choice to reverse the Transco lateral's jurisdictional determination. The decision on the merits must await reasoned decisionmaking from the Commission.